

215.985.3270 ph
215.985.3271 fax

325 Chestnut St
Suite 900
Philadelphia, PA 19106

Brent W. Landau
blandau@hausfeld.com
215.985.3273

November 19, 2014

**Via Federal Express**
Michael E. Kunz
Clerk of Court
United States District Court
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

      Re:   *Satnam Distributors LLC v. Commonwealth-Altadis, Inc., et al.*

Dear Mr. Kunz:

      Enclosed for filing please find the complaint in the above-referenced matter, together with the civil cover sheet, the case management track designation form, the disclosure statement, two copies of the designation form, and a disk containing PDFs of these documents. Also enclosed please find a $400 check for the filing fee.

      Please let me know if you require any additional information or materials. Thank you for your assistance.

      Very truly yours,

      *Brent W Landau*

      Brent W. Landau

Enclosures

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SATNAM DISTRIBUTORS LLC, D/B/A<br>LION & BEAR DISTRIBUTORS,<br>553 Winchester Road, Unit B,<br>Bensalem, PA 19020,<br><br>　　　　Plaintiff,<br><br>　　　　vs.<br><br>COMMONWEALTH-ALTADIS, INC.,<br>5900 N. Andrews Avenue, Suite 1100,<br>Fort Lauderdale, FL 33309;<br><br>COMMONWEALTH BRANDS, INC.,<br>5900 N. Andrews Avenue, Suite 1100,<br>Fort Lauderdale, FL 33309;<br><br>ALTADIS, U.S.A., INC.,<br>5900 N. Andrews Avenue, Suite 1100,<br>Fort Lauderdale, FL 33309; AND<br><br>HAROLD LEVINSON ASSOCIATES, INC.,<br>21 Banfi Plaza,<br>Farmingdale, NY 11735,<br><br>　　　　Defendants. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Satnam Distributors LLC, d/b/a Lion & Bear Distributors ("Satnam" or

"Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendants

Commonwealth-Altadis, Inc., Commonwealth Brands, Inc., and Altadis U.S.A., Inc.

(collectively, "CA"), and Defendant Harold Levinson Associates, Inc. ("HLA") and alleges as

follows based on (a) personal knowledge of those matters relating to Plaintiff, (b) the

investigation of Plaintiff and its counsel, and (c) information and belief:

## INTRODUCTION

1.      Plaintiff brings this action under the antitrust laws of the United States, seeking

treble damages, attorneys' fees, and other relief based upon CA's pricing and price

discrimination practices, as well as HLA's monopolization and attempted monopolization of the

relevant market, and Defendants' conspiracy to monopolize and agreement to restrain trade, as

more fully and particularly described below.  As a result of Defendants' violations of the

antitrust laws, Plaintiff has suffered injury in the form of overcharges and lost business, sales,

and profits.

2.      This action arises from Plaintiff's attempt to challenge HLA, the dominant

distributor of CA's Mass-Market Cigars (as defined below) in Pennsylvania.  On information and

belief, from the time that Plaintiff entered the relevant market in 2011, HLA viewed Plaintiff as a

threat.  Thus, HLA entered into an unlawful agreement with CA to ensure that Plaintiff would

receive discriminatory pricing and unfair promotional terms on its purchases from CA.

3.      Plaintiff, a distributor of cigars and other products to other distributors and

convenience stores, began to establish a business relationship with CA for the sale of CA's

popular mass-market cigar products, such as Dutch Masters, Phillies, and Backwoods.

4.      Plaintiff's attempts were thwarted by CA's institution of a discriminatory pricing

scheme whereby it sold the same cigars at different prices, and offered different promotional

discounts, to HLA, placing Plaintiff at an extreme competitive disadvantage.

5.      As Plaintiff nevertheless gained market share through enhanced customer

outreach and other strategies, CA and HLA heightened the enforcement of their agreement, as a

result of which HLA was able to monopolize the market for distribution of CA's Mass-Market Cigars in Pennsylvania, controlling at least 80% of the relevant market. Defendants' conduct had the ultimate goal and effect of foreclosing Plaintiff from the market for CA's Mass-Market Cigars altogether.

6.      After July 2012, CA refused to deal with Plaintiff, resulting in Plaintiff making zero purchases of CA's Mass-Market Cigars from July to December 2012.  The power of Defendants' agreement was underscored again in January 2013, when CA refused to fill three purchase orders submitted by Plaintiff.  Moreover, in September 2013, CA also declined to ship a purchase order submitted by Plaintiff.

7.      Plaintiff seeks damages and injunctive relief from CA and HLA to account for Plaintiff's lost profits and sales from the inception of the discriminatory and anticompetitive pricing scheme in 2011 through the present.

## PARTIES

8.      Plaintiff Satnam Distributors LLC, d/b/a Lion & Bear Distributors, is a New York limited liability company which is registered to do business in Pennsylvania at a principal place of business located at 1553 Winchester Road, Unit B, Bensalem, PA 19020.  In Pennsylvania, Plaintiff sells various items including mass-market cigars to convenience stores and to other distributors servicing convenience stores.

9.      Defendant Commonwealth Brands, Inc. is a Kentucky corporation which was formed in Bowling Green, Kentucky in 1991.  Throughout the 1990s, the company grew into one of the best-selling cigarette brands in the United States.  On April 1, 1997, Commonwealth Brands was acquired by the Imperial Tobacco Group, PLC.  Through subsequent mergers, Commonwealth Brands expanded its portfolio beyond cigarettes to offer rolling tobacco, rolling

papers, and a selection of cigarette tubes and tube-filling machines.  Commonwealth Brands'
current principal place of business is 5900 N. Andrews Avenue, Suite 1100, Fort Lauderdale, FL
33309.

11.     Defendant Altadis U.S.A., Inc., formerly known as Consolidated Cigar Co., is
the United States subsidiary of the former Altadis, S.A.  Altadis U.S.A. is a Florida corporation
with its principal place of business located at 5900 N. Andrews Avenue, Suite 1100, Fort
Lauderdale, FL 33309.  Altadis, S.A., which was the largest producer of mass market and
premium cigars in the world, was acquired by the Imperial Tobacco Group, PLC in 2008.  In
addition to its premium cigar products and Cuban cigar brands, Altadis U.S.A. has been
recognized in the cigar industry for producing some of the best-selling machine-made, mass-
market cigar brands in the United States, including Dutch Masters, El Producto, Backwoods, and
Phillies.

10.     Commonwealth-Altadis, Inc. is a U.S.-based tobacco sales and distribution
company that delivers tobacco brands and products to wholesale and retail customers.
Established in 2011, the company represents the combined sales, marketing, and operational
history of Defendants Altadis U.S.A. and Commonwealth Brands, Inc., both owned by Imperial
Tobacco Group, PLC.  Commonwealth-Altadis, Inc. is a Florida corporation with its principal
place of business located at 5900 N. Andrews Avenue, Suite 1000, Fort Lauderdale, FL 33309.
The company has a combined sales force of more than 750 employees.

11.     Defendants Commonwealth Brands, Inc.; Altadis U.S.A., Inc.; and
Commonwealth-Altadis, Inc. are collectively referred to herein as "CA."

12.     Defendant Harold Levinson Associates, Inc. ("HLA") is a New York corporation
with its principal place of business located at 21 Banfi Plaza, Farmingdale, NY 11735.  Since it

began in 1977, HLA has expanded into one of the nation's largest full-line convenience store

distributors, and is the dominant convenience store distributor in Pennsylvania.  In 2011, HLA's

sales revenue exceeded $1.3 billion, ranking the company as the seventh-largest convenience

store distributor in the United States.

### JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims

pursuant to 28 U.S.C. §§ 1331 and 1337.

14.    This Court has personal jurisdiction over each Defendant.  Defendants have

conducted business in, and have had continuous and systematic contacts with, the

Commonwealth of Pennsylvania, including the Eastern District of Pennsylvania.  The wrongful

activity in this case concerns the Defendants' purposeful interactions with individuals in the

Commonwealth of Pennsylvania, within the Eastern District of Pennsylvania.  As demonstrated

herein, Defendants have committed wrongful acts and have caused injury to Plaintiff in

Pennsylvania, and particularly, in the Eastern District of Pennsylvania.  Thus, each Defendant

has purposefully availed itself of the privilege of doing business in Pennsylvania, and critical

elements of Defendants' wrongdoing occurred in this Commonwealth.

15.    Defendants transact business within this district, and they carry out interstate trade

and commerce, in substantial part, in this district and/or have an agent and/or can be found in this

district.  Venue is appropriate within this district under U.S.C.  §1391(b) and (c).

### RELEVANT MARKETS

A.    **Relevant Product Market**

16.    The relevant product market in this case is the market for distribution of

CA Mass-Market Cigars.

17.     Mass market, or machine-made, cigars are primarily sold in gas stations and convenience stores, rather than in higher-end specialty cigar shops.  Typically made with short filler and in mass quantities, these cigars are less expensive than handmade premium cigars.  Mass-market cigars account for nearly 80% of the total U.S. cigar business.  Billions of units of mass-market cigars are sold annually compared to hundreds of millions of units for premium, hand-made cigars.  Most mass-market cigars are sold for less than $2 per cigar, and 68% of these mass-market cigars are sold via convenience stores or retail outlets.

18.     In the United States, CA is one of the largest manufacturers of machine-made cigars.  On information and belief, the market for CA Mass-Market Cigars in the Pennsylvania geographic market is approximately $60 million per year.

19.     In 2013, the U.S. market for mass market cigars totaled more than 5 billion cigars.  Given that these cigars are machine-made, they are priced lower than high-end premium cigars, which are often hand-rolled.  Thus, machine-made or mass market cigars attract value-driven customers who shop at convenience stores, gas stations, or other retail outlets.

20.     CA has developed unique packaging and advertising for its mass-market cigar brands.  For example, Dutch Masters cigars are recognizable due to their packaging, which features a famous Rembrandt painting from 1662, The Syndics of the Drapers' Guild.

21.     According to CA's website, Dutch Masters cigars are renowned for their high quality and craftsmanship and are considered "America's #1 Natural Wrapped cigar."

22.     In addition to Dutch Masters, other familiar mass-market cigar brands also are manufactured by CA, including Backwoods, Phillies, Hav-A-Tampa, and White Cat.  CA's website lists 12 brands as the company's most popular cigar products.  According to Cigar.com, Backwoods cigars are "a throwback to the days of the old west" and are comprised of "an

infusion of natural and homogenized tobacco with additive flavoring that is aimed at smokers who are looking for more than just the taste of tobacco in their cigars." Backwoods cigars are identified by their frayed ends, tapered bodies, and unfinished heads. Phillies are made with short or chopped filler tobacco and a homogenized binder to give them a "distinct tobacco flavor," according to Cigar.com. Hav-A-Tampa cigars also are touted as an inexpensive alternative to premium cigars and the brand has become the world's largest-selling wood-tipped cigar, according to CA's website. White Cat cigars, created in 2010, are open-head cigarillos, which CA touts as having "a smooth, seductive aroma available in multiple varieties."

23.     Cigar distributors, such as Plaintiff and HLA, distribute these mass-market cigars to convenience stores and other customers, primarily through other distributors and cash-and-carry wholesalers that service convenience stores directly. Because convenience stores, and therefore the distributor customers of Plaintiff and HLA, need to stock all major brands of mass-market cigars to meet customer demand, distributors such as Plaintiff and HLA must offer a supply of all of the different cigar varieties. Thus, distributors such as Plaintiff must buy all of the major mass-market cigar brands to ensure an adequate supply.

24.     With respect to cigar distribution, there are no reasonably substitutable products for the mass market cigars manufactured and sold by CA. CA is the only cigar manufacturer that manufactures popular brands such as Dutch Masters, Backwoods, Phillies, Hav-A-Tampa, and White Cat. Distributors such as Plaintiff must stock these popular cigar brands and cannot purchase CA's Mass-Market Cigars from any other entity besides CA. If Plaintiff could not supply its customers with CA Mass-Market Cigars, the customer would not substitute another manufacturer's cigar but would instead purchase CA Mass-Market Cigars from a different distributor.

25.     Thus, the relevant product market under which to evaluate Defendants'
anticompetitive conduct is the market for the distribution of CA's Mass-Market Cigars, which
encompasses brands such as Dutch Masters, Backwoods, Phillies, Hav-A-Tampa, and White Cat
cigars ("CA's Mass-Market Cigars").

26.     On information and belief, CA has not entered into any exclusive distributor
agreements in the Pennsylvania geographic market (defined below), and, on information and
belief, CA does not have exclusive distribution territories.

27.     In the Pennsylvania geographic market (defined below), HLA controls the
dominant share of the market for distribution of CA's Mass-Market Cigars.  On information and
belief, as the dominant distributor of CA's Mass-Market Cigars in Pennsylvania, HLA receives
favorable prices and discriminatory promotional discounts under an agreement formed with
Defendant CA and currently accounts for at least 80% of the relevant market.

28.      Given the agreement between CA and HLA, and given that CA is the only entity
that manufactures CA's Mass-Market Cigars, it is unlikely that any new entrant could gain a
meaningful share of the market for distribution of CA's Mass-Market Cigars without a change in
this agreement or without non-discriminatory treatment from CA.

29.     Barriers to entry are high based on the importance of customer goodwill and
based on the time it takes for distributors to establish their reliability for carrying in-demand
products at reasonable prices.  The relationship between the distributor and manufacturer, and
the distributor and convenience store, is forged over a considerable period of time and cemented
only when the convenience store owner can rely on the distributor to consistently stock specific
products.

30.     The practices by Defendants CA and HLA, as alleged in this Complaint, serve as an additional barrier to entry. Potential new distributor entrants will recognize the likely response by CA and HLA to their entry, especially in light of HLA's success in destroying competition in the market for distribution of CA's Mass-Market Cigars, as evidenced by Plaintiff's exclusion from the market after achieving a 30% market share. Any rational, potential entrant would be deterred from entering a market from which a monopolist (HLA) had successfully eliminated a new, upstart rival based on the monopolist's agreement with the manufacturer of the relevant product.

31.     As set forth below, on information and belief, HLA maintains its monopoly power in distributing CA's Mass-Market Cigars through an agreement with CA.

**B.     Geographic Market**

32.     As stated above, convenience stores serve as the primary customers that buy CA's Mass-Market Cigars from Plaintiff and HLA, either directly or through other distributors that service convenience stores directly.

33.     The relevant geographic market is the Commonwealth of Pennsylvania.

34.     Convenience stores, and the distributors that service them, cannot turn to cigar distributors in nearby states outside of the relevant geographic market, such as New Jersey and Delaware, due to differing regulatory schemes and state taxes on cigar sales.

**C.     Interstate Commerce**

35.     CA manufactured and/or sold CA's Mass-Market Cigars, and HLA distributed CA's Mass-Market Cigars, in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

36.     Defendants' business activities substantially affected interstate commerce and caused antitrust injury in this judicial district.

## FACTUAL ALLEGATIONS

**A.     Plaintiff Enters the Pennsylvania Market as a Distributor of CA's Mass-Market Cigars**

37.     Beginning in 2009, Plaintiff operated a successful convenience store distribution business in Jericho, New York.  In early 2011, Plaintiff opened a unit of its distribution business in Southeastern Pennsylvania to focus on the sale of cigars and other products to other distributors and convenience store customers.

38.     Plaintiff focuses its business efforts in Pennsylvania.  Plaintiff formed relationships with distributor customers in this commonwealth.

39.     When Plaintiff entered Pennsylvania, HLA dominated the relevant market, although HLA was not Altadis's exclusive distributor in Pennsylvania.  At the time, on information and belief, HLA accounted for at least 80% of the market for distribution of CA's Mass-Market Cigars in Pennsylvania.

40.     In order to offer the type of mass market cigars most requested by its customers, and to attempt to compete with HLA, Plaintiff began purchasing from Altadis, which manufactured popular mass-market cigar brands such as Dutch Masters, Phillies, and Backwoods.

41.     Between January and August 2011, Plaintiff purchased nearly 6,000 cases of cigars from Altadis, at a cost of approximately $2.2 million. Then and throughout the relevant period, Plaintiff consistently remitted payment on time.  Neither Altadis nor CA ever expressed to Plaintiff that it had decided to charge Plaintiff higher prices or to offer Plaintiff fewer promotional discounts as a result of concerns about Plaintiff's ability to pay on time.

42.     Based on Plaintiff's superior customer service, ability to form relationships with customers, and a more equitable pricing structure for customers in comparison to HLA, Plaintiff ultimately achieved a market share of 30 percent in Pennsylvania despite the discriminatory pricing and anticompetitive conduct described herein, before CA's refusal to deal with Plaintiff. Plaintiff was the only distributor in Pennsylvania that threatened HLA's significant market share.

43.     On information and belief, Plaintiff's initial success came at the expense of HLA, which was the largest distributor of CA's Mass-Market Cigars in Pennsylvania.  On information and belief, HLA's market share ultimately fell to approximately 50% of the relevant market, down from at least 80% before Plaintiff's entry.

**B.      HLA Enters into an Agreement with Altadis (Continued by CA) to Discriminate Against Plaintiff and Foreclose Plaintiff from the Market**

44.     On information and belief, HLA – aware of its dwindling share in the market for distribution of CA's Mass-Market Cigars in Pennsylvania – entered into an agreement with Altadis, which was continued by CA following the merger of Altadis with Commonwealth.  On information and belief, this agreement provided that HLA would receive lower pricing and increased promotional opportunities for CA's Mass-Market Cigars, in comparison to the pricing and promotional discounts offered to Plaintiff.

45.     As a result of this agreement, HLA would be able, and was able, to sell CA's Mass-Market Cigars for less than the price at which Plaintiff could purchase the identical product.

46.     CA's Mass-Market Cigars are sold at a list price set by CA, but are effectively discounted based on the number of free cases provided with a purchase. For example, in a "10+1" deal, one free case is provided when ten are purchased, amounting to an approximately

9% discount. In an "8+1" deal, one free case is provided when eight are purchased, amounting to an approximately 11% discount.

47.     CA's Mass-Market Cigars are also effectively discounted based on the amount of promotional funds provided for purposes such as "shows" that were either physical (i.e., exhibitions) or virtual (i.e., internet-based). For example, between May 15 and June 15, 2011, Altadis offered a promotion of $2.50 per unit of Dutch Masters and $2.00 per unit of Phillies, capped at $12,000, for an effective discount of approximately 8% off list price.

48.     On information and belief, as a result of HLA's agreement with Altadis (continued by CA after the merger), HLA paid lower prices than Plaintiff by means of more free cases and more promotional funds. Nevertheless, Plaintiff's superior customer service allowed Plaintiff's business to grow, even though Plaintiff purchased CA's Mass-Market Cigars at discriminatory prices.

49.     On information and belief, Plaintiff's prices for CA's Mass-Market Cigars were 10 to 20% higher than the prices charged to HLA. This price difference for identical products was not justified by any cost savings to CA.

50.     The 10 to 20% price disparity cannot be explained by HLA's volume purchases of CA's Mass-Market Cigars.  As evidenced by e-mail exchanges where Plaintiff offered to buy $10 million of CA's Mass-Market Cigars in one large purchase, Plaintiff also was willing to purchase large volume amounts from CA.

**C.     Altadis Discriminates Against Plaintiff (August-October 2011)**

51.     Despite the discriminatory prices and promotional discounts offered to Plaintiff by Altadis, Plaintiff attempted to develop its relationship with Altadis by sending sales representatives a series of e-mails in August and September 2011 with proposals for increasing sales.

52.     On information and belief, HLA was given significant and discriminatory discounts by Altadis at the same time that Altadis refused to offer similar pricing to Plaintiff.  On information and belief, HLA was therefore able to sell CA's Mass-Market Cigars for significantly less than the listed price of the cigars as a result of these discriminatory discounts.

53.     In August 2011, Plaintiff requested an in-person meeting with the Altadis representative, Andrew Panagoplos, to discuss a proposed sales order of $10 million.  In response, Mr. Panagoplos replied he would be unable to meet with Plaintiff at any point during that month and suggested that Plaintiff e-mail him the proposal for the $10 million sales order.

54.     In further correspondence regarding the potential $10 million sales order, Plaintiff communicated to Altadis that it was seeking a standard "10+1" promotional deal, with additional promotional discounts.

55.     Altadis failed to accept Plaintiff's proposals and never submitted a counter-offer to the $10 million proposal.  On information and belief, this was a result of the company's agreement with HLA. On September 1, 2011, Plaintiff offered to fly to Altadis's headquarters in Fort Lauderdale, Florida for a face-to-face meeting if it would move the order forward. Mr. Panagoplos replied that he had passed the proposal onto his superiors, but they were "not ready to make a decision."

56.     On September 15, 2011, Plaintiff expressed its concerns with Altadis's conduct, writing that it did not want to attempt such large volume sales, in the range of $10 million or $50 million, and then "end up doing not even 5 million because when I get into action, everybody else will be loaded and done with their purchases, and I will miss the entire opportunity."

57.     On September 19, 2011, Plaintiff submitted three purchase orders to Altadis,

totaling more than $1.2 million, based on a discount and a promotion of one free case for every

20 cases purchased (a "20+1" deal).  This promotion was less beneficial to Plaintiff then the

previously-proposed "10+1" deal.  When it submitted the purchase orders, Plaintiff also inquired

as to the pricing and promotional disparities offered to various distributors in the market.

Plaintiff wrote via e-mail that it "cannot buy at a higher price than what my competition is

selling for."

58.     On September 19, 2011, Mr. Panagoplos emailed Plaintiff that "[a]s of now I am

still not able to do any kind of deal." That same day, Altadis announced a list price increase

effective September 22, 2011, and Mr. Panagoplos emailed again to state that "because of the

price increase I cannot approve anything without my GM's approval." He suggested that Plaintiff

place an order at list price before the price increased, and Plaintiff responded that this was not

possible:

> Thanks and I appreciate the response and I am trying to understand what
> you are saying but the regular price is more than the price on the street. I
> am in the business for the long haul and if I do not get the right price I stay
> away from those products. So I will not be placing any order at the regular
> price, but if you are able to get my proposal approved it will be great if not
> as I said earlier we will be doing business at some other time.
>
> I am sure there will be a lot of other distributors who will be buying in
> very big numbers because of the price increase but I am very confident
> those who will be buying huge quantities will be those distributors who do
> get a better pricing than the normal volume discount available to me and I
> understand they have been buying from Atladis for years and I am very
> new. So it is all understandable.

59.     The next day, Plaintiff wrote again to Mr. Panagoplos to explain that his

customers were able to buy from Plaintiff's competition at a lower price than the price at which

Plaintiff itself could buy.  Upon information and belief, many of Plaintiff's competitors were

purchasing from HLA at discounted prices.  Given these discounts, Plaintiff wrote to Mr.

Panagoplos that he would take at loss unless Altadis offered a comparable discount to what

Plaintiffs' competition were receiving:

> Today after the notice of the price rise and everything a customer of mine
> was able to book an order with a 2 nd source jobber for 50 cases (Total
> value around $ 24,000.00) of dutch master Palma Box for $38.50 for
> wednesday delivery that is tomorrow, and if I purchased a 1000 or more
> cases (Total value minimum $450,000.00) directly from Altadis after my
> volume discount my cost would be around $38.65.
>
> Other of my customers tell[s] me they can buy even today for $38.25.

60.     Mr. Panagoplos did not deny that it was selling to Plaintiff's competition at lower

prices, instead emailing Plaintiff to state that "I have been informed that we will not be doing any

promoting this month due to the price increase." Plaintiff purchased less than $30,000 worth of

cigars from Altadis in September 2011 and did not purchase any cigars from Altadis in October

2011.

**D.      Following the Merger of Altadis and Commonwealth, Price Discrimination
            and Anticompetitive Conduct Continue (November 2011-January 2012)**

61.     In early November 2011, it was publicly announced that Altadis would merge

with Commonwealth Brands, Inc., forming the new entity Commonwealth-Altadis, Inc.  The

new company would combine the sales and marketing efforts of both Altadis U.S.A. and

Commonwealth Brands (collectively, "CA").

62.     Following the merger, Plaintiff's sales representatives at CA changed to Russell

Mancuso and Denis Murphy, who had worked for the former Commonwealth Brands entity.

Plaintiff had a prior good relationship with Mr. Mancuso and had also worked with Mr. Murphy

purchasing cigarette paper from Commonwealth in New York.  Based on the strength of this

prior relationship, Plaintiff began receiving promotional pricing offers.  Such promotional offers

included the addition of a "free" case with every eight (8) or ten (10) cases purchased or "bill back credits" such as $3.00 or $4.00 for every box sold of a certain CA Mass-Market Cigar brand.

63.     In or around November 2011, Plaintiff spoke with Mr. Mancuso about the need for fair and equitable pricing as between Plaintiff and its competition.  Upon information and belief, Plaintiff's prices still totaled approximately 10% higher than the prices offered to HLA. Mr. Mancuso promised Plaintiff that it would be given the same prices and discounts as HLA.

64.     On November 16, 2011, Mr. Mancuso approved Plaintiff's purchase order, which included a "10+1" discount.  However, Plaintiff reported to Mr. Mancuso that prices still were not equal between Plaintiff and its competition due to a promotion offered to the competition but not to Plaintiff:

> By this promotion my competitors are selling about $12.50 lower than what I will be paying for per case after working the dead net price with the free case. I have enclosed an invoice from one of my competitors for your review. Without the similar promotion I would be thrown on the sidelines till the effect of this promotion subsides that is till mid December.
>
> For eg the competitors are selling a box of Dutch Masters for $ 37.50 and my cost is $38.55 dead dead net that is I will be paying $12,500.00 for every truck load I buy.

65.     CA representatives insisted to Plaintiff that it was receiving the same pricing given to HLA. On information and belief, CA's statements were not true.

66.     Despite the discriminatory pricing from CA, Plaintiff purchased over 5,700 cases of CA's Mass-Market Cigars between November 2011 and January 2012, at a cost of over $2.3 million.  Although considerable pricing disparity still existed between the prices offered to Plaintiff in comparison with the prices offered to HLA, Plaintiff's continued efforts to highlight

these differences to CA's new managers following the merger led to an improvement in the discriminatory pricing during this time.

**E.      Plaintiff Succeeds Despite Defendants' Conduct (February-May 2012)**

67.      Between February and May 2012, Plaintiff purchased more of CA's Mass-Market Cigars than ever before: over 15,500 cases at a cost of over $6.6 million. As a result of this large volume, Plaintiff was able to capture approximately 30% of the market for distribution of CA's Mass-Market Cigars in Pennsylvania. However, this was despite continued discriminatory pricing compared to HLA, which caused Plaintiff to pay higher prices and lose sales.

68.      Plaintiff continued to inform CA's new managers of lower sale prices in the market in an effort to further reduce the price disparities.  On February 2, 2012, Plaintiff wrote to Mr. Mancuso and Mr. Murphy that "DM Box is being sold by other leading distributors to other smaller wholesalers between $ 38.00 and $ 38.69 these smaller distributors th[e]n in turn sell this DM Box for as low as $38.75, my cost on this item by buying in truck load quantities, prepaid is $38.55. On the DM foil Cigarillo other leading distributor is selling between $ 21.25 thru $21.75 my cost on being part of the truck load order is $ 22.02. And I could go on and on with the same story with the Backwood and Philly Blunts etc."

69.      In late February 2012, Plaintiff met with CA sales representatives at a trade show. Following the meeting, Mr. Mancuso told Plaintiff to submit orders with a promotional discount and that the orders would be processed.  Plaintiff submitted eleven orders totaling more than $2.6 million on February 27, 2012, to be shipped during March 2012. But despite Mr. Mancuso's verbal approval, the discounts were not processed for an additional two months.

70.      On March 2, 2012, Plaintiff wrote to Mr. Murphy to note the "deep discounts and lower prices" that were "being offered at the ongoing virtual trade show, for delivery for the

entire month of march by a leading distributor on long island" – HLA. Plaintiff stated that it was "surprised" and "may be you decided to give them twice the promo money than you give me."

71.    On March 21, 2012, Plaintiff wrote again to Mr. Murphy with a request for promotional funds:

> I have proposed [these] numbers based on how much Money I have to put in these products to be competitive in these items in the market place. Based on the sale price of these products in the market place by smaller cash and carry distributors I am sure other smaller and bigger distributors are getting more PM money on the above items than what I have requested.
>
> For example my cost on the DM foil cigarillo when I buy from you after figuring out the 11th free case is $ 22.03 and cash and carry warehouses who are not your direct buying customers are selling for $21.25. For your reference to back this up I have enclosed invoice and a packing label for this item. . . .
>
> My business for these items will increase by about 400% once you confirm the PM monies I have requested. Please take the time and resolve my request as the delay is costing lost sales for these items.

72.    On April 4, 2012, Plaintiff wrote to Mr. Murphy and Mr. Mancuso that "HLA is selling at the trade show the backwood 5% below my dead net cost and the philli 6% below my dead net cost. That means their cost is at least 20 to 25% below my cost. . . . I have only requested about 9% in pm [promotional] monies which would bring down my **cost** by about 2 to 3% less than my competition is **selling** for."

73.    On information and belief, because Plaintiff was making significant market gains despite discriminatory pricing, HLA complained about Plaintiff to CA, following which HLA and CA agreed that CA would treat Plaintiff even less favorably than before. On information and belief, Mr. Mancuso and Mr. Murphy received substantial criticism inside CA for working toward a more equitable (though still discriminatory) pricing structure with Plaintiff.

74.     In or around May 2012, Mr. Murphy related to Plaintiff that it was accused of "disrupting the marketplace" through its competition with HLA.

75.     On May 8, 2012, Mr. Murphy called Plaintiff to inform it that CA would not offer Plaintiff any promotions other than the "8+1" deal through June. In an email that day, Plaintiff expressed concern about how the lack of notice for this change would interrupt its business, hurt its goodwill and reputation with its customers, and hurt it "financially in a big way." On May 10, 2012, Plaintiff wrote again that it was "confused about the all of a sudden change" and that his customers would get upset and hurt its credibility.

76.     On May 16, 2012, Plaintiff wrote to Mr. Mancuso and Mr. Murphy that "by abruptly suspending my ongoing promotions things have become very difficult for me and I face a very competitive disadvantage. I feel I have been targeted and blamed for all the problems in the market place only because I am seen as a CommonWealth guy and not and Altadis Guy. I am seen as the guy from the opposition Party and I am seen as somebody who soon will have a good market share in the Altadis products and the Monopoly of a few distributors will be broken."

77.     On May 22, 2012, Mr. Mancuso spoke with Plaintiff by telephone. The next day, Plaintiff sent an email to Mr. Mancuso and Mr. Murphy to thank them "for listening and understanding about what is going on in the market place" and attached an order for over $500,000 despite the absence of any promotional funds. Plaintiff wrote:

> This is my Third half million dollar order without any Promotional monies authorized. However again based on the price and the unlimited quantity being sold by other major distributors I believe either somebody in your organization behind your back has authorized a better deal or a better buy down than the 8 and One that I am getting. . . .
>
> Please put me in a level pla[ying] field along with the other major distributors. I can assure you I will be a very beneficial partner for Commonwealth in the Long Run.

F. **Defendants Intensify Their Discriminatory and Anticompetitive Conduct and Ultimately Exclude Plaintiff from the Market Entirely (June-December 2012)**

78.     In June 2012, the promotion allowing Plaintiff to receive one free case for every eight cases purchased (the "8+1" deal) also abruptly ended.  On June 14, 2012, Plaintiff wrote in an e-mail that its business had been badly affected as a result of other distributors having a considerable pricing advantage, and that "even today they are selling below my cost."

79.     This pricing change had the effect of dramatically reducing the volume of CA's Mass-Market Cigars that Plaintiff was able to purchase. In May 2012, Plaintiff had purchased over 1,000 cases per week, and purchased similar quantities in early June 2012, prior to CA's discontinuance of the "8+1" deal. After June 6, 2012, Plaintiff purchased under 500 cases for the rest of the month, and then purchased under 500 cases for the whole month of July (on July 3, 2012).

80.     The July 3, 2012 purchase was the last purchase of CA's Mass-Market Cigars that Plaintiff made. On that day, Plaintiff wrote to Mr. Mancuso and Mr. Murphy that it was "wondering what we can do to help and promote your products. I am all about volume and promoting your brands." On July 9, 2012, Plaintiff wrote again: "I assure you our joint effort will give you great results in the sales and further developing of your brands."

81.     On July 23, 2012, Plaintiff inquired about what promotional funds and discounts would be available for two planned two orders totaling over $1 million. On August 5, 2012, Plaintiff wrote to Mr. Mancuso and Mr. Murphy:

> It is about a month now since we had our conversation and although you assured me that the deal 10 to 12% off list price which will be made available to me is the best deal available to all major distributors and no other distributor will be getting anything more. **Market pricing of your products is 100% contradictory of this.** . . . Other "Major" Distributors are selling to my friends at 12 to 13% off list price up front of your Altadis

products. This is not something which has just happened but is going on for all of 2012 and is going on today.

It is my hand full of friends who give other major distributors about 10 to 15 million dollar business every month and these are my friends with whom I wine and dine on a regular basis. All these friends show me their invoices from where they buy how much they buy and what they pay, because they rather buy from me than other distributors.

In the month of March and April we did about 2 Million of business each month with you and that was just the beginning but after that our deal changed and I tried to continue to business but other major distributors were selling 2% to 3% below my cost. Hence we have fallen to $ 00.00 business in the month of July and August and almost negligible business in the month of June.

My calculations tell me that other major distributors are getting at least 22 to 28% off list price and most of it up front. I will be happy to place now and regularly there after about $ 5 million to $ 10 Million in orders subject to me getting about 18% off list price up front. Our request of 18% discount is based on market pricing of your products.

82.   Nevertheless, CA did not make non-discriminatory pricing available to Plaintiff, and no order was placed. In or around September 2012, Mr. Mancuso's employment with CA was terminated.  Upon information and belief, other managers who worked for Commonwealth prior to the merger also were fired during this period, as employees from the Altadis side asserted control of CA's sale operations and were able to fully implement the agreement with HLA, which enhanced the discriminatory pricing presented to Plaintiff.

83.   As a result of the foregoing conduct, with Plaintiff unable to compete in the market for distribution of CA's Mass-Market Cigars, HLA regained its previously-lost market share. On information and belief, by the beginning of 2013, HLA had achieved at least an 80% market share for distribution of CA's Mass-Market Cigars in Pennsylvania.

G.     **Defendants Persist in their Conduct and Reinforce the Refusal to Deal (January 2013-Present)**

84.     A new salesperson, Rich Reisinger, was assigned to Plaintiff in or around late December 2012. On or about January 2, 2013, Mr. Reisinger distributed information to Plaintiff and others about a promotion by which it could receive a 7% credit on its purchases of CA's Mass-Market Cigars. On January 21, 2013, Plaintiff submitted three purchase orders, totaling 1,200 cases at a cost of over $620,000.

85.     As of February 4, 2013, Plaintiff had not received any notification that the three purchase orders submitted in January had been processed.  Mr. Reisinger sent an e-mail to his superiors, inquiring whether the orders had been received and processed, and wrote that Plaintiff "is looking for these orders.  Did you receive them?"  Officials from CA replied that they would research the order and be back in touch about the status.

86.     On February 6, 2013, Plaintiff emailed CA's Cyndi Pignanelli to request an update. In her email reply dated the same day, Ms. Pignanelli wrote to Plaintiff that she would research the status of the order and "get back to you immediately" regarding the status. However, she did not do so. None of the three purchase orders submitted in January 2013 were ever filled or shipped to Plaintiff.

87.     On information and belief, senior managers at CA, Paul Mathews and Eric Workman, were upset with Mr. Reisinger for offering Plaintiff this promotion. On information and belief, this is because the promotion deviated from CA's agreement with HLA to refrain from offering Plaintiff non-discriminatory prices or, indeed, to refrain from dealing with Plaintiff at all. On information and belief, HLA received much higher discounts than 7%.

88.     Plaintiff eventually spoke with Mr. Mathews by phone and asked about the problem in processing the orders. Mr. Mathews replied that he would talk to CA's lawyers

before giving Plaintiff an answer. Since that time, Plaintiff has not had any communication with Mr. Mathews.

89.     In early September 2013, CA announced a price increase.  Despite this increase, and despite the significant price discrimination that benefitted HLA, Plaintiff placed an order for $9,349.97 of CA's Mass-Market Cigars.  CA's customer service department sent Plaintiff a proforma invoice for this order on September 12, 2013.  The invoice listed September 17, 2013 as the anticipated shipping date for the twenty (20) cases of Mass-Market Cigars ordered by Plaintiff.

90.     However, CA never shipped the order.  Plaintiff made repeated phone calls to CA's customer service department to determine the reason for the delay.  Plaintiff was advised by a customer service representative that CA's senior management had cancelled the order and closed his account.  Plaintiff never received a written or verbal explanation for this action by CA.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

91.     As detailed above, on information and belief, HLA reacted to Plaintiff's modest success by entering into an agreement with Altadis (continued by CA following the merger), and subsequently ensuring that this agreement was enforced.  HLA and CA embarked on a course of anticompetitive conduct with the overall goal of excluding Plaintiff from the market for distribution of CAI's Mass-Market Cigars in Pennsylvania.

92.     On information and belief, based on the terms of its agreement with HLA, CA sought to drive Plaintiff from the market by actions that included, but were not limited to: (1) overcharging Plaintiff on purchases of CA's Mass-Market Cigar products in comparison to the prices at which identical products were sold to HLA, (2) offering smaller promotional funds to Plaintiff in comparison to the promotional discounts on identical products given to HLA and

eventually stopping all promotional pricing offered to Plaintiff, and (3) refusing to deal with Plaintiff and closing Plaintiff's purchasing account in Pennsylvania.

93.     As a result of the anticompetitive conduct alleged herein, Plaintiff suffered overcharges, lost profits, lost sales, and damage to its business.

94.     As a result of the anticompetitive conduct alleged herein, HLA has secured more than 80% of the market for distribution of CA's Mass-Market Cigars in Pennsylvania. The agreement between CA and HLA has also caused the exclusion of Plaintiff from the relevant market.

95.     As a result of the anticompetitive conduct alleged herein, prices for CA's Mass-Market Cigars in Pennsylvania were higher than they would have been in the absence of the anticompetitive behavior. Specifically, customers could have purchased CA's Mass-Market Cigars at lower prices if Plaintiff and HLA competed with each other to offer the lowest prices in a competitive market. With HLA now encompassing at least 80% of the relevant market, customers have more limited options in purchasing CA's Mass-Market Cigars and pay higher prices than they otherwise would pay.

## CAUSES OF ACTION

### Count I
### Violation of 15 U.S.C. § 13 (Robinson-Patman Act)
### (Against Commonwealth-Altadis, Inc., Commonwealth Brands, Inc., and Altadis U.S.A., Inc.)

96.     Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set forth herein.

97.     At all relevant times, CA and HLA were, and continue to be, engaged in commerce, as defined by and in 15 U.S.C. §13 of the Robinson-Patman Act.

98.     During the relevant time periods herein above set forth and continuing through the present, CA has manufactured and sold, and continues to manufacture and to sell, CA's Mass-Market Cigar products, including brands such as Dutch Masters, Backwoods, Phillies, White Cat, and others, in commerce.

99.     At all relevant times, CA has manufactured and sold its Mass-Market Cigar products to multiple distributors located throughout Pennsylvania, including Plaintiff.

100.    Until July 2012, Plaintiff purchased large quantities of CA's Mass-Market Cigars from CA (including from Altadis prior to the merger with Commonwealth Brands).  From January 2011 until July 2012, Plaintiff purchased approximately $12.8 million in CA's Mass-Market Cigars.

101.    On information and belief, at all relevant times and as more specifically described above, CA, in the course of commerce, has sold and continues to sell CA's Mass-Market Cigars to HLA at discriminatory prices. On information and belief, these prices were, and remain, substantially less than the prices that CA charged Plaintiff for the identical products. Thus, CA's pricing was discriminatory as between Plaintiff and HLA.

102.    On information and belief, as more specifically described above, in the course of commerce, CA has sold its Mass-Market Cigar products to HLA along with promotions such as rebates, discounts, and other allowances.  Although some discounts were offered to Plaintiff at various points during the relevant period, on information and belief Plaintiff was not offered pricing, discounts, or promotions on the same terms as offered to HLA for identical products.

103.    On information and belief, CA's discriminatory pricing practices were not justified based on any differences in the cost of manufacture, sale, or delivery resulting from any

different quantities in which the products were sold or delivered to Plaintiff, as compared to HLA.

106.    On information and belief, CA's pricing and related discriminatory practices were not justified based upon any changing conditions affecting the market for, or the marketability of, CA's Mass-Market Cigars.

105.    Until July 2012, when CA stopped selling cigars to Plaintiff, Plaintiff and HLA marketed and sold CA's Mass-Market Cigars to the same smaller distributors and convenience stores located within the Pennsylvania geographic market, and did so contemporaneously.

106.    Until July 2012, as a result of CA's discriminatory pricing and related practices with respect to its sales of mass market cigar products, Plaintiff was forced to purchase CA's Mass-Market Cigar products at significantly higher prices than HLA, or was unable profitably to purchase them at all, both of which led to a substantial decrease in profits and sales.

107.    As a direct and proximate result of the discriminatory pricing and related practices engaged in by CA, Plaintiff's ability to compete with HLA for distribution of CA's Mass-Market Cigars in Pennsylvania has been substantially diminished.  As a result of CA's refusal to deal with Plaintiff after July 2012, Plaintiff's ability to compete with HLA in the relevant market has been completely eliminated.

108.    The overall effect of CA's discriminatory actions and related conduct has been to substantially lessen competition in the market for distribution of CA's Mass-Market Cigars in Pennsylvania.

109.    CA's discriminatory conduct, as detailed herein, has injured, destroyed and/or prevented fair competition among Plaintiff and its competitors, particularly HLA, in the market for distribution of CA's Mass-Market Cigars in Pennsylvania. On information and belief, HLA,

which served as Plaintiff's principal competitor in Pennsylvania, received the benefit of CA's price discrimination and related improper practices.

110.    CA's acts of price discrimination as detailed herein constitute multiple violations of the Robinson-Patman Act, including, but not limited to, 15 U.S.C. §§ 13(a) and (d).

111.    As a proximate result of CA's price discrimination as detailed herein, Plaintiff has suffered substantial economic losses and other damage to its business, reputation, and relationship with customers, including, but not limited to, overcharges, lost sales, and lost profits.

**Count II**
**Violation of 15 U.S.C. § 13 (Robinson-Patman Act)**
**(Against HLA)**

112.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set forth herein.

113.    HLA, in the course of such commerce as described above, knowingly induced and/or knowingly has received discriminatory prices for CA's Mass-Market Cigars from CA in the relevant geographic market.

114.    Throughout the relevant period, HLA received significant discounts and promotions from CA, while at the same time, Plaintiff did not receive as considerable discounts and promotions from CA, restricting Plaintiff's ability to compete with HLA.

115.    The effect of HLA's knowing inducement and/or knowing receipt of discrimination in pricing and promotion as detailed herein has been to substantially lessen competition in the market for distribution of CA's Mass-Market Cigars in Pennsylvania.

116.    HLA's knowing inducement and/or knowing receipt of discrimination in pricing and promotion as detailed herein has injured, destroyed and/or prevented fair competition among Plaintiff and HLA.

117.    HLA's knowing inducement and/or knowing receipt of discriminatory pricing and unfair business conduct as detailed herein constitute multiple violations of the antitrust laws of the United States, including, but not limited to, violations of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d), and 13(f).

118.    As a direct and proximate result of HLA's knowing inducement and/or knowing receipt of discriminatory pricing and unfair business conduct as detailed herein, Plaintiff has suffered substantial economic losses and other damage to its business, reputation, and relationship with customers, including, but not limited to, overcharges, lost sales, and lost profits.

### Count III
### Monopolization in Violation of Sherman Act Section 2 (15 U.S.C. § 2)
### (Against HLA)

119.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set forth herein.

120.    As detailed above, the relevant product market is the market for distribution of CA's Mass-Market Cigars, and the relevant geographic market is the Pennsylvania region.

121.    HLA possessed (and currently possesses) monopoly power in the market for distribution of CA's Mass-Market Cigars in Pennsylvania.  HLA's share of the market is at least 80%.  As a result of HLA's anticompetitive practices and agreement with CA, it has succeeded in excluding Plaintiff – a new market entrant which had achieved a 30% share – from the market. Thus, HLA was able to maintain its monopoly power in the relevant market.

122.    HLA, as alleged herein, has willfully acquired and maintained its monopoly in the market for the distribution of CA's Mass-Market Cigar products in Pennsylvania by engaging in anticompetitive conduct, including, but not limited to, knowingly inducing and/or receiving discriminatory prices and promotions, as set forth herein, and agreeing on a discriminatory

pricing structure with CA.  These discriminatory prices and promotions allowed HLA to pay

substantially less than Plaintiff for CA's Mass-Market Cigars and permitted HLA to receive

enhanced promotional offers.

123.    The anticompetitive effects of HLA's conduct outweigh any purported pro-

competitive justifications.

124.    As a direct, foreseeable, and proximate result of HLA's anticompetitive conduct,

Plaintiff was damaged by the lost sales and profits associated with distribution of CA's Mass-

Market Cigars, the diminution in value of Plaintiff's business, and the loss of reputation with

customers who could no longer rely on Plaintiff to stock these highly-requested cigar products.

125.    As a direct and proximate result of HLA's anticompetitive conduct, Plaintiff has

not purchased CA's Mass-Market Cigars from CA since July 2012.  Thus, Plaintiff been driven

from the relevant market altogether and will remain unable to compete if HLA is not enjoined

from engaging in its anticompetitive conduct.

### Count IV
### Attempted Monopolization in Violation of Sherman Act Section 2 (15 U.S.C. § 2)
### (Against HLA)

126.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set

forth herein.

127.    HLA has specifically intended its conduct, as alleged herein through its agreement

with CA, to have the effect of controlling prices and/or destroying competition in the market.

128.    HLA's anticompetitive conduct, including but not limited to its knowing

inducement and/or knowing receipt of discriminatory prices, has been directed at accomplishing

the unlawful objective of controlling prices or destroying competition in the market.

129.    HLA's anticompetitive conduct presents a dangerous probability that HLA will

succeed in its attempt to monopolize the market, in that, among things: (1) HLA's current market

share of at least 80% gives rise to its monopoly power in the market; (2) since HLA embarked on

its anticompetitive scheme by forming an agreement with CA, it has successfully led to the end

of Plaintiff's business relationship with CA; and (3) given the success of HLA's scheme, the

barriers to entry in this market are even more substantial and would likely deter other would-be

competitors from entering the market.

130.    As a direct and proximate result of HLA's wrongdoing as alleged herein, Plaintiff

has been injured in its business, having suffered, among other things, damages from lost sales

and profits associated with distribution of CA's Mass-Market Cigars, the diminution in value of

its business, and the loss of reputation with convenience store customers and their distributors

who could no longer rely on Plaintiff to stock these highly-requested cigar products.

<u>**Count V**</u>
<u>**Conspiracy to Monopolize in Violation of Sherman Act Section 2 (15 U.S.C. § 2)**</u>
<u>**(Against All Defendants)**</u>

131.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set

forth herein.

132.    At all relevant times, CA and HLA knowingly and intentionally conspired to

acquire, maintain, and enhance HLA's monopoly power in the relevant market – i.e., the market

for distribution of CAI's Mass-Market Cigars in Pennsylvania– and to exclude Plaintiff from

being competitive in the market.

133.    During the relevant period, CA and HLA violated Section 2 of the Sherman Act,

15 U.S.C. § 2, by willfully and unlawfully conspiring to acquire, maintain, or enhance monopoly

power for HLA in the market for distribution of CA's Mass-Market Cigars in Pennsylvania by

forming an agreement by which HLA would receive more discounted prices and other

promotional and rebates on mass market cigar products from CAI while Plaintiff would not

receive similar price promotions and discounts.

134.    As set forth herein, CA and HLA specifically intended that the lower prices,

allowances, and substantial promotional discounts offered to HLA would maintain and enhance

HLA's monopoly power in the relevant market, and thereby injure Plaintiff.

135.    CA and HLA each committed at least one overt act in furtherance of the

conspiracy, in that the Defendants formed an agreement to offer discriminatory prices and

promotions for CA's Mass-Market Cigars and ultimately to refuse to deal with Plaintiff, and in

that CA sold its Mass-Market Cigars to HLA at discriminatory prices and ultimately refused to

deal with Plaintiff.

136.    As a result of the foregoing conspiratorial conduct, Plaintiff paid more for CA's

Mass-Market Cigars than it would have but for the Defendants' conduct.  Plaintiff eventually

was completely foreclosed from purchasing CA's Mass-Market Cigars, while HLA assumed an

even greater share of the market.  As described above, upon information and belief, HLA's

percentage of the market rose to at least 80% following Defendants' conduct.

137.    There was no legitimate business justification for the conspiracy between CA and

HLA to acquire or maintain monopoly power for HLA.  The conspiratorial actions by

Defendants provided no market efficiencies or other legitimate business value to customers who

had business relationships with distributors such as Plaintiff and HLA.

138.    As a direct and proximate result of the Defendants' conspiracy to acquire or

maintain monopoly power for HLA, Plaintiff was injured in the form of paying higher prices for

the same product -- mass market cigars manufactured by CA -- than it would have paid in the absence of Defendants' unlawful, conspiratorial conduct.

139.   Plaintiff's injuries specifically consist of: (1) being denied the opportunity to purchase CA's Mass-Market Cigars at lower prices or better promotions, (2) paying higher prices for CA's Mass-Market Cigars products than it would have paid in the absence of Defendants' unlawful, conspiratorial conduct, and (3) eventually being foreclosed from purchasing any of CA's Mass-Market Cigar products from CA. These injuries are of the type that the Sherman Act was designed to prevent, and flow from that which makes Defendants' conduct unlawful.

140.   Plaintiff seeks damages and other relief as permitted by law for the injuries it suffered as a result of Defendants' violations of the Sherman Act, 15 U.S.C. § 2.

**Count VI**
**Unlawful Agreement in Restraint of Trade in Violation of Sherman Act Section 1**
**(15 U.S.C. § 1)**
**(Against All Defendants)**

141.   Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if set forth herein.

142.   CA and HLA entered into an agreement for the purposes of foreclosing Plaintiff from effectively competing in the market for distribution of CA's Mass-Market Cigars. The agreement achieved the purpose for which it was undertaken and unreasonably restrained trade.

143.   The anticompetitive effects that resulted from Defendants' unlawful agreement outweigh any purported precompetitive justifications.

144.   CA and HLA, through their unlawful agreement in restraint of trade, have harmed competition by ensuring that Plaintiff was deprived from receiving equal pricing terms for CA's Mass-Market Cigars. Under healthy and fair competition, Plaintiff would have received similar

prices, rebates, and promotional discounts to those offered to HLA, and Plaintiff would have continued providing competition to HLA in the Pennsylvania region.

145.    As a direct, foreseeable, and proximate result of Defendants' agreements in restraint of trade, Plaintiff was damaged by, without limitation, lost sales and profits, costs of trying to maintain its business reputation and relationship with its customers, and diminution in value of its business, all in amounts to be proven at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all matters so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(i)      An award of compensatory damages, to be trebled;

(ii)     An award of reasonable attorney's fees and the costs of suit;

(iii)    An award of prejudgment interest on the compensatory award of damages;

(iv)    That Defendants be enjoined from anticompetitive conduct as alleged herein;

(v)     That Plaintiff be granted such other and further relief, whether of a legal or equitable nature, which the Court deems necessary, proper, and/or required based on the facts presented.

DATED:  November 19, 2014

Respectfully submitted,

*Brent W Landau*
Brent W. Landau (PA Bar No. 202189)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3273
Fax: (215) 985-3271
blandau@hausfeld.com

Mindy B. Pava (*pro hac vice* to be filed)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Fax: (202) 540-7201
mpava@hausfeld.com

*Counsel for Plaintiff Satnam Distributors*
*LLC d/b/a Lion & Bear Distributors*

34

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Satnam Distributors, LLC, d/b/a Lion & Bear Distributors

**DEFENDANTS**
Commonwealth-Altadis, Inc., Commonwealth Brands, Inc., Altadis U.S.A., Inc., and Harold Levinson Associates, Inc.

**(b)** County of Residence of First Listed Plaintiff   Bucks County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Broward County, FL
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brent W. Landau (PA Bar No. 202189)
Hausfeld LLP, 325 Chestnut Street, Suite 900, Philadelphia, PA 19106
(215) 985-3273

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. Sections 1, 2, and 13
Brief description of cause:
Price discrimination, monopolization, attempted monopolization, agreement in restraint of trade

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE                                    DOCKET NUMBER

DATE
11-19-2014

SIGNATURE OF ATTORNEY OF RECORD
*Brent W Landau*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Satnam Distributors LLC, d/b/a Lion & Bear Distributors | : | CIVIL ACTION |
| v. | : | |
| Commonwealth-Altadis, Inc., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.            ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                                                                     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (x )

| | | |
|---|---|---|
| 11-19-2014 | Brent W. Landau | Plaintiff Satnam Distributors LLC |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-985-3273 | 215-985-3271 | blandau@hausfeld.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

APPENDIX G

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Satnam Distributors LLC, d/b/a Lion & Bear Distributors   :
                                                          :
                                                          :
                            V.                            :         Civil Action
                                                          :         No: _____
Commonwealth-Altadis, Inc., et al.                        :

### DISCLOSURE STATEMENT FORM

Please check one box:

                                                              Satnam Distributors LLC, d/b/a

☒       The nongovernmental corporate party, ___Lion & Bear Distributors___
               , in the above listed civil action does not have any parent corporation and
               publicly held corporation that owns 10% or more of its stock.

❏       The nongovernmental corporate party, _____
               , in the above listed civil action has the following parent corporation(s) and
               publicly held corporation(s) that owns 10% or more of its stock:

_____

_____

_____

_____

___11-19-2014_____          _____Brent W Landau_____
        Date                                                      Signature

               Counsel for: _____Plaintiff_____

**Federal Rule of Civil Procedure 7.1 Disclosure Statement**
     (a)    Who Must File; Contents.  A nongovernmental corporate party must file
           two copies of a disclosure statement that:
           (1)    identifies any parent corporation and any publicly held corporation
                 owning10% or more of its stock;  or

           (2)    states that there is no such corporation.

     (b) Time To File; Supplemental Filing.  A party must:
           (1)    file the disclosure statement with its first appearance, pleading,
                 petition, motion, response, or other request addressed to the court;
                 and
           (2)    promptly file a supplemental statement if any required information
                 changes.

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 553 Winchester Road, Unit B, Bensalem, PA 19020

Address of Defendant: 5900 N. Andrews Avenue, Suite 1100, Fort Lauderdale, PA 33309

Place of Accident, Incident or Transaction: Pennsylvania

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☒ No☐

Does this case involve multidistrict litigation possibilities?     Yes☐ No☒

*RELATED CASE, IF ANY:*

Case Number: _____     Judge _____     Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?     Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Brent W. Landau, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 11-19-2014          Brent W Landau          202189

Attorney-at-Law          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 11-19-2014          Brent W Landau          202189

Attorney-at-Law          Attorney I.D.#

CIV. 609 (5/2012)