IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SATNAM DISTRIBUTORS LLC | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| COMMONWEALTH-ALTADIS, INC., et al. | : | NO.  14-6660 |
| Defendants. | : | |

**FILED**

OCT 1 4 2015

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## MEMORANDUM

**L. Felipe Restrepo, U.S. District Judge**                           **October 14, 2015**

Plaintiff Satnam Distributors LLC ("Plaintiff") brings this action, seeking treble damages and injunctive relief, against the following defendants: a convenience store distributor, Harold Levinson Associates, Inc. ("HLA"); a manufacturer of cigarette-related products, Commonwealth Brands, Inc. ("Commonwealth"); a manufacturer of mass market cigars, Altadis U.S.A., Inc. ("Altadis"); and the sales and distribution company for Commonwealth and Altadis, Commonwealth-Altadis, Inc. ("CA, Inc."). Plaintiff alleges HLA entered into an agreement with Defendants CA, Inc., Commonwealth, and Altadis (collectively, "CA") to receive favorable prices and promotional discounts on mass market cigars, so that HLA could monopolize the market for distribution of those cigars. Plaintiff asserts that these actions violate Section 2 of the Clayton Act, as amended by the Robinson-Patman Act (hereinafter, "Robinson-Patman Act"), 15 U.S.C. § 13, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Before the Court are motions to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by HLA & CA (collectively, "Defendants"). The Court held oral argument on both

**ENTERED**

OCT 1 4 2015

CLERK OF COURT

1

motions, which are now ripe for disposition.  For the following reasons, Defendants' motions are
granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and HLA are distribution companies in the business of supplying convenience
stores with a diverse range of merchandise, including mass market cigars.  Compl. ¶¶ 8, 12, 23.
Mass market cigars are machine-produced in mass quantities and made with short filler, unlike
handmade premium cigars.  *Id.* ¶¶ 17-19.  They are less expensive than premium cigars, and
billions of units are sold annually in the United States; almost 70% of mass market cigars
produced are sold at convenience stores or similar retail outlets.  *Id.* ¶ 17.  As the largest
producer of mass market cigars in the world, Altadis is well known in the United States for its
popular brands, including Dutch Masters, Backwoods, Phillies, Hav-A-Tampa, and White Cat.
*Id.* ¶¶ 11a[1], 22, 24-25.

In addition to making direct sales to convenience stores, Plaintiff and HLA sell to other
distributors and cash-and-carry wholesalers, which, in turn, service convenience stores.  *Id.* ¶ 23.
Convenience store owners rely on distributors to consistently stock in-demand products at
reasonable prices.  *See id.* ¶ 29.  Convenience stores demand that distributors supply them with
the *full line* of all major mass market cigar brands available in the marketplace, and they will not
substitute one manufacturer's brands for another.  *See id.* ¶¶ 23-24.  Consequently, distributors
with convenience store customers, like Plaintiff and HLA, must stock and sell *all* major brands
of mass market cigars.  *See id.*

---

[1]     The Complaint inadvertently includes two paragraphs numbered "11."  *See* Pl.'s Br. 25 n.13.  For
ease of reference, the Court will refer to the first paragraph "11" as "11a" and the second as "11b."

In early 2011, Plaintiff opened a unit of its distribution business in Southeastern Pennsylvania to supply other distributors and convenience stores with various merchandise, including mass market cigars. *Id.* ¶ 37. At the time Plaintiff began conducting business in Pennsylvania, HLA controlled 80% of the market for distribution of CA's mass market cigars. *Id.* ¶ 39. In order to compete with HLA, Plaintiff began purchasing mass market cigars from Altadis. *Id.* ¶ 40. Between January and August 2011, Plaintiff purchased nearly 6,000 cases of cigars from Altadis for over $2 million. *Id.* ¶ 41. Plaintiff's market share of the CA mass market cigar distribution business in Pennsylvania grew initially to 30%, while HLA's market share decreased to 50%. *Id.* ¶¶ 42-43.

In response to Plaintiff's success, Plaintiff alleges, HLA entered into an agreement with Altadis to receive pricing and promotional discount advantages over Plaintiff. *Id.* ¶ 44. For instance, Altadis gave HLA more free cases with each purchase than it gave Plaintiff, or provided HLA with more promotional funds than it provided Plaintiff. *Id.* ¶¶ 46-48. Because Plaintiff was not offered the same promotions that Altadis provided to HLA, Plaintiff asserts it paid Altadis, in effect, 10% to 20% more than HLA paid for identical products. *Id.* ¶¶ 49-50.

Despite the disadvantages it was experiencing, Plaintiff attempted to continue to develop its relationship with Altadis. *Id.* ¶ 51. In August 2011, Plaintiff corresponded with an Altadis representative about a purchase order for $10 million and requested a "standard '10+1' promotional deal, with additional promotional discounts." *Id.* ¶¶ 53-54. Plaintiff made repeated attempts to discuss the large volume sale with Altadis, but the Altadis representative responded that the company was "not ready to make a decision." *Id.* ¶¶ 54-55. In September 2011, Plaintiff submitted three purchase orders to Altadis for over $1.2 million total, based on a discount and promotion for a "20+1" deal, which was less beneficial than the original "10+1"

3

deal Plaintiff previously requested. *Id.* ¶ 57. In proposing this second deal, Plaintiff complained to the Altadis representative that it was *buying* at a price higher than its competition's *selling* price. *Id.* ¶¶ 57-59. Plaintiff's offer was denied by Altadis, and Altadis raised its list prices. *Id.* ¶ 58. As a result, Plaintiff purchased less than $30,000 worth of cigars from Altadis in September 2011. *Id.* ¶ 60.

In November 2011, CA, Inc. was established as a sales and distribution company to facilitate the sales and marketing of Altadis and Commonwealth products.[2] *Id.* ¶ 61. Once CA, Inc. was established, Plaintiff began to receive promotional offers, such as "8+1" and "10+1" deals or "bill back credits," which were dollar credits for every box sold of a certain CA mass market cigar brand. *See id.* ¶ 62. However, Plaintiff still continued to pay approximately 10% more than HLA for Altadis products, *id.* ¶¶ 63-65, allowing HLA to *sell* CA's mass market cigars for lower prices than Plaintiff *purchased* products from CA, Inc. *Id.* ¶¶ 69-72.

Despite Plaintiff's awareness of these price discrepancies, it purchased over 5,700 cases of CA's mass market cigars for over $2.3 million between November 2011 and January 2012. *Id.* ¶ 66. From February 2012 to May 2012, Plaintiff purchased over 15,500 cases for over $6.6 million. *Id.* ¶ 67. In May 2012, Plaintiff was informed by a CA sales representative that Plaintiff was "disrupting the marketplace" by competing with HLA and that Plaintiff would not be offered any promotions other than the "8+1" deal through June. *Id.* ¶¶ 74-75. Although Plaintiff was concerned that the lack of notice for this change would detrimentally impact Plaintiff's business and goodwill, Plaintiff submitted an order for over $500,000, without any promotional funds, that month. *Id.* ¶¶ 75, 77. Once the "8+1" promotional deal ended in June,

---

[2]     CA, Inc. serves as the only vendor through which Commonwealth and Altadis sell their tobacco products to wholesale and retail customers.

4

Plaintiff was unable to financially maintain the volume it had been purchasing from CA, Inc. and Plaintiff reduced its purchase volume significantly. *Id.* ¶¶ 78-79.

In July 2012, Plaintiff reached out to his sales contacts at CA, Inc. about two orders, totaling over $1 million, and requested similar discounts that other distributors in the market were receiving. *Id.* ¶ 81. However, CA, Inc. did not offer Plaintiff similar pricing, so Plaintiff did not submit an order. *Id.* ¶ 82. As a consequence of Plaintiff's inability to compete in the distribution market for CA's mass market cigars, HLA regained its dominance and achieved at least 80% market share by early 2013. *Id.* ¶ 83.

On or about January 2, 2013, a new CA, Inc. sales representative assigned to Plaintiff's account sent out a general notice to Plaintiff and other distributors about CA, Inc.'s promotion for 7% credit on purchases of CA's mass market cigars. *Id.* ¶ 84. Plaintiff subsequently submitted three purchase orders for a total of 1,200 cases at over $620,000 total; these three orders were not processed. *Id.* ¶¶ 84-85. Both the representative and Plaintiff asked CA, Inc.'s management about the status of Plaintiff's orders, but neither received a response. *Id.* ¶¶ 85-86, 88. Plaintiff alleges that CA, Inc.'s senior managers were upset that Plaintiff was offered a promotion, which was in violation of CA, Inc's alleged agreement with HLA to discriminate against Plaintiff in sales of Altadis products. *Id.* ¶ 87. In September 2013, CA, Inc. announced a price increase and Plaintiff submitted an order for CA's mass market cigars. *Id.* ¶ 89. Although CA, Inc.'s customer service department initially sent Plaintiff an invoice for this order, along with an anticipated shipping date, CA, Inc. later canceled the order and closed Plaintiff's account. *Id.* ¶¶ 89-90. Plaintiff never received a written or verbal explanation for CA, Inc.'s decision. *Id.* ¶ 90.

5

Plaintiff subsequently filed this action alleging the following claims against all Defendants: conspiracy to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count V); and unlawful agreement in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count VI). *See generally* Compl. Against HLA, Plaintiff also alleged: a violation of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d), and 13(f) for knowingly inducing or receiving a discrimination in price (Count II); and claims of monopolization (Count III) and attempted monopolization (Count IV) under the Sherman Act. *Id.* Against CA, Plaintiff asserted an additional claim of price discrimination, in violation of §§ 13(a) and 13(d) of the Robinson-Patman Act (Count I). *Id.* All Defendants now seek to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).[3]

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 8, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To satisfy Rule 8, a complaint must include factual allegations that, when taken as a whole, render the plaintiff's entitlement to relief plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 569 n.14 (2007). The complaint need not contain detailed factual allegations, *id.* at 555, but must contain "facts sufficient to raise a right to relief above the speculative level," *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 246 (3d Cir. 2010) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007)). In other words, complainants must allege "enough facts

---

[3]     The CA defendants argued in their motion, as an initial point, that the Counts I, V, and VI should be dismissed against them because Plaintiff did not specify which particular defendants committed which acts, but instead referred to these defendants collectively. *See* CA's Br. 3-5. However, at oral argument, Defendants noted that there is overlap between the entities in the CA organizational structure. Tr. 4:21-25. Further, Plaintiff agreed, during argument, to voluntarily dismiss Commonwealth, a cigarette manufacturer, from the action if discovery reveals Commonwealth was not involved in the conduct at issue. Tr. 7:19-8:22. The Court finds that Plaintiff has sufficiently stated claims against the CA defendants at this early stage of litigation but will permit these defendants to reassert this argument, if appropriate, once discovery on the corporate organization is complete.

6

to raise a reasonable expectation that discovery will reveal evidence of the necessary element."
*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citation and internal quotation
marks omitted). Mere "labels and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." *Twombly*, 550 U.S. at 555.

In considering a motion to dismiss for failure to state a claim pursuant to Federal Rule of
Civil Procedure 12(b)(6), the court must accept as true the factual allegations in the complaint
and construe those facts in the light most favorable to the nonmoving party. *Fowler v. UPMC
Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court should disregard all legal conclusions
included in the complaint, and decide whether the remaining factual allegations indicate that the
plaintiff has a plausible, not just conceivable or possible, claim for relief. *See id.* at 210-11;
*Ashcroft v. Iqbal*, 556 U.S. 662, 678-82 (2009).

## III.    DISCUSSION

### A. Robinson-Patman Act

In Counts I and II of the Complaint, Plaintiff alleges that Defendants violated the
Robinson-Patman Act. *See* Compl. ¶¶ 96-118. Specifically, Plaintiff alleges in Count I that CA
unlawfully discriminated between Plaintiff and HLA in the pricing of its mass-market cigars, in
violation of Section 2(a) of the Robinson-Patman Act. *See* Compl. ¶¶ 96-111. Section 2(a)
makes it unlawful for sellers to discriminate in price between different purchasers of a like
commodity. 15 U.S.C. § 13(a). Plaintiff alleges in Count II that HLA knowingly induced and/or
received such discriminatory prices in violation of Section 2(f) of the Act.[4] *See id.* ¶¶ 112-18.

---

[4]      The "Causes of Action" portion of Plaintiff's Complaint also lists Section 2(d) among the
provisions of the Robinson-Patman Act allegedly violated by both CA and HLA. Compl. ¶¶ 110, 117.
Section 2(d) of the Act prohibits sellers from discriminating between customers in the provision of
*services or facilities* in connection with the sale of a commodity. 15 U.S.C. § 13(d). Section 2(a)
addresses discrimination in *price*. 15 U.S.C. § 13(a); *see also* 3-27 Federal Antitrust Law § 27.7
("Section 2(a) . . . is intended to cover differences in the price actually paid by the customers . . . . A

Section 2(f) prohibits buyers from knowingly inducing or receiving goods at a more favorable price than the price made available to another buyer. 15 U.S.C. § 13(f).

The Act does not "ban all price differences charged to different purchases of commodities of a like grade and quality; rather, [it] proscribes price discrimination only to the extent that it threatens to injure competition," or causes competitive injury. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006). The Supreme Court has delineated three types of competitive injury that give rise to a claim under the Robinson-Patman Act: primary line, secondary line, and tertiary line injury. *Id.* Here, Plaintiff has alleged a secondary-line injury: one in which "price discrimination [] injures competition among the discriminating seller's customers."[5] *Id.*

      i.   *Section 2(a) Claim*

To state a *prima facie* case of price discrimination where there is a secondary-line injury, a plaintiff must allege: "(1) that sales were made to two different purchasers in interstate commerce; (2) that the product sold was of the same grade and quality; (3) that defendant discriminated in price as between the two purchasers;" and (4) a competitive injury. *Feesers,*

---

discrimination in *services or facilities*, on the other hand, is a benefit which does not reduce the price to any customer . . . ."). Plaintiff's allegations center on *price* discrimination and do not indicate that Defendants' conduct involved the provision of "services or facilities." *See, e.g.*, Compl. ¶ 110 ("CA's acts of *price discrimination* as detailed herein constitute multiple violations of the Robinson-Patman Act, including . . . 15 U.S.C. §§ 13(a) and (d)." (emphasis added)). Plaintiff's opposition briefing likewise focuses on *price discrimination* and does not address any unlawful provision of "services or facilities" or Section 2(d) specifically. *See* Pl.'s Opp. Br. 6 (describing the Robinson-Patman Act claims as "garden-variety price discrimination").

    In addition, Plaintiff lists a violation of Section 2(a) in Count II, Compl. ¶ 117, but clarifies in its brief that "HLA's liability under the Robinson-Patman Act" is for "its knowing receipt or inducement of discriminatory prices." Pl.'s Opp. Br. 12. The Court, therefore, construes Plaintiff to maintain the following claims at this stage: (1) Section 2(a) claim against the CA defendants (Count I); and (2) Section 2(f) claim against HLA (Count II).

[5]    Primary-line injury arises from conduct that harms competitors at the level of the discriminating seller, while tertiary-line injury refers to harm to competition among the customers of the favored and disfavored purchasers. *Volvo*, 546 U.S. at 176.

*Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 212 (3d Cir. 2007) ("*Feesers I*"). In other words, the allegations must demonstrate that "the defendant made *at least two contemporary sales* of the same commodity at different prices *to two different purchasers*," with the effect of injuring competition. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 228 (3d Cir. 2008) (emphasis added).

To support its price discrimination claims, Plaintiff lists numerous instances of complaints it made to CA representatives from August 2011 to September 2013 that HLA was *selling* CA's mass market cigars at a price lower than Plaintiff's *purchase* price from CA. Compl. ¶¶ 51-52, 57-59, 64-65, 68, 71, 77, 81. For example, Plaintiff alleged:

> "Plaintiff wrote to Mr. Murphy and Mr. Mancuso [from] [CA] that 'HLA is selling at the trade show the backwood 5% below [his] dead net cost and the philli 6% below [his] dead net cost. That means [HLA's] cost is at least 20 to 25% below [Plaintiff's] cost.'"

*Id.* ¶ 72. Defendants argue that Plaintiff's Section 2(a) claim fails because Plaintiff has not sufficiently alleged that CA made two contemporaneous sales of the same commodity – products of like grade and quality – to Plaintiff and HLA. HLA's Reply (Doc. 28) 4-5; CA's Reply (Doc. 27) 2-5. According to Defendants, Plaintiff must identify the particular brands of CA's mass market cigars which were sold to HLA at more favorable prices and the specific times at which those sales were made, which Plaintiff has failed to do. *See* Tr. 39:24-40:4.

Courts, however, generally do not require at the pleading stage the level of specificity proposed by Defendants. *See Marjam Supply Co. v. Firestone Bldg. Products Co., LLC*, 2012 WL 6005709, at *2 (D.N.J. Nov. 30, 2012) ("*Marjam I*") (allegations that the defendant-manufacturer "sold identical . . . roofing products" to plaintiff's competitors at a more favorable price than the plaintiff in 2010 and 2011 was sufficient to survive a motion to dismiss); *Staton Holdings, Inc. v. Russell Athletic, Inc.*, 2009 WL 4016117, at *6 (N.D. Tex. Nov. 20, 2009)

9

("allegation that [manufacturer] sell[s] the identical products to numerous wholesalers permits the reasonable inference that the sales are contemporaneous" (internal quotation marks and citation omitted)); *Genesee Vending Inc. v. R.J. Reynolds Tobacco Co.*, 2005 WL 1048753, at *3-4 (E.D. Mich. May 2, 2005) (complaint satisfied the requirements of a price discrimination claim by "identif[ying] the products that were the subject of discriminatory treatment" as all of the defendant-manufacturer's cigarette brands, "including the Winston, Camel, and Salem brands"); *Flash Electronics, Inc. v. Universal Music & Video Distribution Corp.*, 312 F. Supp. 2d 379, 398-99 (E.D.N.Y. 2004) (finding the plaintiff's "general allegations" that a company sold "its product" at lower prices to competitors sufficient to survive a motion to dismiss).  And Defendants have not identified any binding authority requiring sales to be pleaded with the level of specificity they propose.[6]  *See AlarMax Distributors, Inc. v. Honeywell Int'l, Inc.*, 2015 WL 3645259, at *13 (W.D. Pa. June 9, 2015) (noting that the Third Circuit "has only distinguished situations involving two *actual* sales from those involving a single sale and those in which only an offer to sale has been made." (citation and internal quotation marks omitted)).  Therefore, the Court finds Plaintiff's allegations sufficient at this stage to indicate at least two contemporaneous sales by CA of the same commodity at different prices to Plaintiff and HLA.

---

[6]     HLA also argues that Plaintiff's discriminatory pricing claims should be limited to the period prior to July 2012 because Plaintiff did not *actually* buy CA's mass market cigars after that month.  Tr. 81:3-7.  However, Plaintiff alleges that in early September 2013, Plaintiff placed an order with CA and CA responded with an invoice, which included a delivery date.  Compl. ¶ 89.  Some courts have concluded that where an executory contract exists between a buyer and a seller, the buyer may be considered a "purchaser" for the purposes of Robinson-Patman Act "even if there was no actual sale."  *En Vogue v. UK Optical Ltd.*, 843 F. Supp. 838, 846 (E.D.N.Y. 1994) (citing *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 617 F.2d 468, 471 (7th Cir.1980)); *see also Aluminum Co. of Am. v. Tandet*, 235 F. Supp. 111, 114 (D. Conn. 1964).  To the extent that there was an executory contract between CA and Plaintiff in September 2013, Plaintiff was a disfavored purchaser under the Robinson-Patman Act after July 2012.  HLA may reassert this argument at the summary judgment stage, if warranted by the facts revealed in discovery.

CA also argues that Plaintiff's Section 2(a) claim fails because Plaintiff has not alleged the fourth element of its *prima facie* case: competitive injury. CA's Br. 13-14; Tr. 65:8-14. To sufficiently allege competitive injury, Plaintiff need not allege that CA's price discrimination *actually*, in fact, harmed competition. *See Feesers I*, 498 F.3d at 213. Rather, Plaintiff must set forth facts that support a plausible inference, or reasonable possibility, of harm to competition. *Id.* To do so, Plaintiff must allege that: (1) it competed with HLA to sell CA's mass market cigars to the same group of customers; and (2) there was price discrimination over time by CA.[7] *See id.* Defendant contends that Plaintiff has not adequately alleged the first prong of competitive injury: that Plaintiff competed with HLA to sell CA's mass market cigars.

Plaintiff alleges HLA's share of the market for distribution of CA's products fell from 80% to 50% when Plaintiff's market share rose to 30%, and that HLA regained its 80% market share when Plaintiff was foreclosed from continued participation in the market. Compl. ¶¶ 39, 42-43, 95; Tr. 50:15-21. Viewing these facts in the light most favorable to Plaintiff, this inverse relationship indicates that Plaintiff was indeed in direct competition with HLA for the same customers. Although Defendants argue that Plaintiff must plead with specificity which actual customers it lost to HLA as a result of the price discrimination, Defendants cite to no authority requiring such precision at the pleading stage. Furthermore, courts acknowledge that determining whether a plaintiff is in actual competition with an alleged "competitor" for the same group of customers requires a careful, fact-specific analysis of each party's customers to assess whether each party is "directly after the same dollar." *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 213-14 (3d Cir. 2010) ("*Feesers II*") (citations and internal quotation marks

---

[7]    Sufficient allegations of this nature give rise to a rebuttable inference of "competitive injury" under Section 2(a). *Feesers I*, 498 F.3d at 213.

omitted). At this early stage of litigation, the Court concludes that Plaintiff has alleged a plausible competitive injury sufficient to survive a motion to dismiss.

        ii.    *Section 2(f) Claim*

To bring a claim under Section 2(f), a plaintiff must first establish a *prima facie* case against the seller under Section 2(a). *See Feesers II*, 591 F.3d at 208-09 (3d Cir. 2010). In addition, a plaintiff must plead "sufficient facts to support an inference that [a competitor] induced or received such [discriminatory] pricing 'knowingly.'" *AlarMax*, 2015 WL 3645259, at \*14 (citing 15 U.S.C. §13(f)). "Buyers are not liable if they are innocent beneficiaries of discriminatory prices." *Id.* at \*14 (quoting *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc*., 723 F.3d 1019, 1022 (9th Cir. 2013)). To overcome a motion to dismiss a Section 2(f) claim, therefore, a plaintiff must allege that the buyer knew both that (1) it was charged a lower price than a competitor and (2) that the seller had no justifiable reason for offering the buyer such a price. *Id.*; *Marjam Supply Co. v. Firestone Bldg. Products Co., LLC*, 2014 WL 5798383, at \*4 (D.N.J. Nov. 7, 2014) ("*Marjam II*"). In the Complaint, Plaintiff alleges that HLA knowingly induced or received significant discounts and promotions from CA, when Plaintiff was not receiving the same deals, thereby preventing fair competition with HLA in the market for distribution of CA's mass market cigars. Compl. ¶¶ 113-14. Plaintiff further asserts that CA's discriminatory pricing structure cannot be justified by the existence of any special market conditions or differences in buying practices between HLA and Plaintiff. *Id.* ¶¶ 101-04.

In its motion to dismiss, HLA argues that Plaintiff's Section 2(f) claims fails because its allegations are conclusory, as there are "no factual allegations in the Complaint that HLA *knew* that it was receiving prices" that were discriminatory. HLA's Br. 17; *see also* Tr. 76:22-77:4.

12

But allegations of *actual* knowledge of prohibited discriminatory pricing are not always necessary to support a Section 2(f) claim; allegations of *constructiv*e knowledge may also suffice. *Marjam II*, 2014 WL 5798383, at *4; *see also Automatic Canteen Co. v. Fed. Trade Comm'n*, 346 U.S. 61, 79-80 (1953) ("trade experience in a particular situation can afford a sufficient degree of knowledge"). Courts have held that pleadings describing such "constructive" knowledge were sufficient in cases where the buyer was a "sophisticated wholesaler[]," *Hygrade Milk & Cream Co. v. Tropicana Products, Inc.*, 1994 WL 38549, at *3 (S.D.N.Y. Feb. 4, 1994); where the buyer controlled "more than 75% of the relevant market," *Flash*, 312 F. Supp. 2d at 400; or where the buyer's "knowledge of the discriminatory pricing was apparent from information and discussions that plaintiff[] conducted with salespersons from the manufacturers," *Coal. for a Level Playing Field, L.L.C. v. Autozone, Inc.*, 2001 WL 1763440, at *6 (E.D.N.Y. Oct. 18, 2001).

　　Here, Plaintiff alleges HLA controlled 80% of the market for distribution of CA's mass market cigars in Pennsylvania prior to Plaintiff's entry into the market. Compl. ¶ 39. HLA is, according to Plaintiff, "the dominant convenience store distributor in Pennsylvania" and the seventh-largest in the nation. *Id.* ¶ 12. Therefore, HLA's trade experience in the market for distribution of mass market cigars, at least in Pennsylvania, would likely have alerted HLA to discriminatory pricing on CA's products during the relevant time period, given the circumstances alleged by Plaintiff. Plaintiff further alleges that it received a warning from a CA sales representative that Plaintiff was "disrupting the marketplace" by competing with HLA, suggesting that HLA complained to CA when Plaintiff threatened HLA's dominance. *Id.* ¶ 74; Tr. 85:2-20. And Plaintiff alleges that HLA's complaint prompted CA's termination of its relationship with Plaintiff, which effectively "forced [Plaintiff] out of the market." Tr. 90:5-9.

13

Taking these allegations together, the Court finds that Plaintiff has adequately pleaded at least constructive knowledge, and thus has adequately pleaded that HLA knowingly induced CA to engage in discriminatory pricing, or at least, had constructive knowledge that it received favorable prices from CA.

        iii.   *Antitrust injury*

As a final point of argument in HLA's brief, HLA contends that Plaintiff's Robinson-Patman Act claims must fail because Plaintiff has failed to adequately allege antitrust injury.[8] *See* HLA's Br. (Doc. 23) 27-30. Under the antitrust laws, in order to recover treble damages, which Plaintiff seeks here, Plaintiff must allege an *antitrust* injury, i.e., an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[9] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Stated differently, Plaintiff must allege an actual injury-in-fact, which was caused by the violation at issue, and which is the type of injury contemplated by the statute. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981). *Antitrust* injury is distinct from *competitive* injury. "While competitive injury concerns the potential effect certain conduct may have on competition generally . . . the focus of antitrust injury is on whether the challenged conduct has actually caused harm to the plaintiff." *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels*

---

[8]     The CA defendants also cursorily reference a similar argument in a footnote, while arguing that Plaintiff has failed to allege the "competitive injury" element of Plaintiff's *prima facie* case of price discrimination. *See* CA's Br. (Doc. 22-2) 16 n.10.

[9]     The Robinson-Patman Act is "a prophylactic statute which is violated merely upon a showing that the effect of such discrimination *may* be substantially to lessen competition." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-62 (1981) (citations and internal quotation marks omitted). It does not provide a private right of action for treble damages. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 218 (2d Cir. 2004). This right is provided by Section 4 of the Clayton Act, which authorizes private suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." *Id.* In order to recover treble damages under the Clayton Act, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *Id.* at 562. "It must prove more than a violation of § 2(a), since such proof establishes only that injury *may* result. *Id.* (emphasis in original).

*& Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) (citations and internal quotation marks omitted).

Here, Plaintiff has pleaded injuries of the type that would result from unlawful price discrimination and has alleged that those injuries flowed from the Defendants' anti-competitive conduct. Plaintiff alleges CA charged higher prices to Plaintiff than to HLA for its mass-market cigars, which HLA knowingly received, and that Plaintiff was the specific target of CA and HLA's alleged anticompetitive practice. Plaintiff further avers that as a result of these actions, Plaintiff was ultimately foreclosed from the distribution market and suffered lost sales and profits. *See* Compl. ¶¶ 94, 111. Plaintiff also alleges that CA's price discrimination, and HLA's inducement and/or receipt thereof, resulted in lesser competition in the market for distribution of CA's cigars,[10] ultimately harming customers since the "prices for CA's Mass-Market Cigars in Pennsylvania were higher than they would have been . . . in a competitive market." *Id.* ¶¶ 94-95. At bottom, Plaintiff has alleged facts sufficient, at this stage, to connect its losses to Defendants' conduct violating the Robinson-Patman Act.

Having found that Plaintiff has adequately pleaded the necessary elements of Section 2(a) and Section 2(f) claims and has pleaded antitrust injury for a Robinson-Patman Act claim, Defendants' motions to dismiss these claims are denied.

### B. Sherman Act

In Counts III through V of the Complaint, Plaintiff asserts violations of Section 2 of the Sherman Act, alleging that HLA monopolized (Count III), attempted to monopolize (Count IV), and conspired with CA to monopolize (Count V) the market for distribution of CA's mass

---

[10]     As discussed above, by alleging an inverse correlation between HLA's market share and Plaintiff's market share for the distribution of CA's mass market cigars, Plaintiff's allegations strongly suggest that Plaintiff was HLA's only major competitor in the market. *Id.* ¶¶ 43, 83, 94.

market cigars. Compl. ¶¶ 119-40. In addition, Plaintiff alleges HLA and CA entered into an agreement to foreclose Plaintiff from effectively competing in the Pennsylvania market and violated Section 1 of the Sherman Act by unreasonably restraining trade (Count VI). *Id.* ¶¶ 141-45. Defendants contend, however, that Plaintiff's claims under both sections of the Sherman Act cannot survive a motion to dismiss because Plaintiff has not alleged a plausible relevant product market. *See* Tr. 30:6-11; CA's Br. 5-7; HLA's Br. 19-22; CA's Reply 7-9; HLA's Reply 8.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To state a claim under Section 1, the plaintiff must show: (1) the defendant was part of the contract or conspiracy; and (2) that the conspiracy "imposed an unreasonable restraint on trade." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011); *Toledo*, 530 F.3d at 218. The plaintiff bears the initial burden to show that the alleged conspiracy had an anticompetitive impact in the relevant market. *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 668 (3d Cir. 1993).

Put succinctly, Section 2 prohibits three types of conduct: monopolization, attempted monopolization, and conspiracy to monopolize. 15 U.S.C. § 2; *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993). A plaintiff bringing a monopolization claim must allege that the defendant had: "(1) [] possession of monopoly power in the relevant market and (2) [its] willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom*, 501 F.3d at 307 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). A plaintiff bringing an attempted monopolization claim must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

16

probability of achieving monopoly power." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (quoting *Spectrum*, 506 U.S. at 456). Finally, a plaintiff claiming conspiracy to monopolize must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Dentsply*, 602 F.3d at 253.

Critically, Plaintiff's Sherman Act claims must contain sufficient allegations of a viable relevant product market in order to survive Defendants' motions to dismiss.[11] *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Broadcom*, 501 F.3d at 307; *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). A defined relevant product market is essential to evaluate whether there is monopoly power or dangerous probability of monopolization in violation of Section 2, or to determine the existence of market power for purposes of Section 1. *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 (E.D. Pa. 2008). It is Plaintiff's burden to define the relevant product market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (citations omitted). Interchangeability of use means that one product is "roughly equivalent" to another product for its intended use, and assessment of interchangeability involves an examination of price, use, and qualities of the goods. *Id.* at 437; *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). Determining cross-

---

[11]    The Supreme Court has held that for purposes of Section 1 claims, certain categories of restraints are deemed *per se* unreasonable "without inquiry into the particular market context." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984). Restraints of trade found to be *per se* illegal include horizontal agreements to fix prices or to allocate markets. *Leegin*, 551 U.S. at 886 (2007). The parties appear to agree that Defendants' alleged actions should not be considered *per se* unreasonable and thus demand an "an inquiry into market power and market structure," which requires Plaintiff to allege a product market. *Id.*

17

elasticity of demand, which is an indicator of interchangeability, *Queen City*, 124 F.3d at 437,

requires an analysis of whether "the rise in the price of a good within the relevant product market

would tend to create a greater demand for other like goods in that market," *Tunis Bros.*, 952 F.2d

at 722. A broad product market can contain narrower submarkets, but a party attempting to

subdivide the product market must give the court reason "for fragmentizing the . . . [market] into

lesser [submarket] units."[12] *Grinnell*, 384 U.S. at 572.

Generally, "proper market definition can be determined only after a factual inquiry,"

*Queen City*, 124 F.3d at 436, and thus courts are hesitant to dismiss antitrust claims for failure to

plead a relevant product market, *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). But

there is no "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant

market." *Queen City*, 124 F.3d at 436. And where a plaintiff attempts to allege a product market

"that makes no economic sense under any set of facts," courts will dismiss Sherman Act claims

even at early stages of litigation. *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp.

150, 154 (S.D.N.Y. 1988). In addition,

> where the plaintiff fails to define its proposed relevant market with
> reference to the rule of reasonable interchangeability and cross-
> elasticity of demand, or alleges a proposed relevant market that
> clearly does not encompass all interchangeable substitute products
> even when all factual inferences are granted in plaintiff's favor, the
> relevant market is legally insufficient and a motion to dismiss may
> be granted.

*Queen City*, 124 F.3d at 436.

---

[12] Whether a product market can be divided into narrow submarkets will depend on factors such as "industry or public recognition of the submarket[s] as [] separate economic entit[ies], the product's peculiar characteristics and uses, [and] . . . distinct customers" and prices, to name a few. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (rejecting the argument that medium-priced shoes are a different submarket from low-priced shoes because the public recognizes the relevant lines of commerce as men's, women's and children's shoes).

Plaintiff alleges with specificity a relevant product market: "the market for distribution of CA Mass-Market cigars" in "the Commonwealth of Pennsylvania." Compl. ¶¶ 16, 33.  Plaintiff supports this market definition by alleging that that there are no substitutable products for any manufacturer's brands, including CA's, because convenience stores and wholesalers who purchase from distributors must carry *all* major brands of mass market cigars to satisfy end-user demand.  *Id.* ¶ 23; Tr. 27:8-16.  Further, because convenience stores and wholesalers purchase all of their cigar needs from a single distributor, and must themselves carry all manufacturers' brands, they will only purchase mass market cigars from distributors that carry all manufacturers' brands.  Compl. ¶ 23; Pl.'s Br. 15-16.

Boiled down, Plaintiff alleges that to compete in the marketplace, a distributor of mass market cigars must carry the full line of all major mass market cigar brands produced by each manufacturer.  Plaintiff's market definition, however, isolates CA's mass market cigars specifically.  Plaintiff concedes that its product market – the market for distribution of a single manufacturer's brands – is a novel one, but maintains that evidence obtained in discovery will support this market definition.  Tr. 17:23-18:20.

Courts routinely reject Sherman Act claims at the motion to dismiss stage where such claims involve single-brand or single-manufacturer product markets.  *See, e.g., Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 264-65 (S.D.N.Y. 2000) (dismissing antitrust claim for failure to plead a relevant product market, citing similar cases, and stating that "the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market" (internal quotations and citation omitted)); *Deep S. Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 1989 WL 48400, at *8 n.1 (S.D.N.Y. May 2, 1989) (dismissing the plaintiff's proposed product market of Pepsi franchises only and citing decisions in which a single product

19

market was rejected); *Theatre Party*, 695 F. Supp. at 154 (dismissing monopolization claim

where the plaintiff had defined the relevant product market as advance sales of selected tickets to

the early run of a *single* Broadway show, since other forms of entertainment could be adequate

substitutes); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001) (UCLA

women's soccer program could not be its own market because other schools run similar

programs that compete in recruitment of student-athletes).  Only in rare, fact-specific

circumstances not present here have such claims been permitted, such as where customers were

"locked into" purchasing a manufacturer's tying products, often "aftermarket" parts and

services,[13] *see, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992), or

where the particular manufacturer's product had total market dominance, *see Hewlett-Packard

Co. v. Arch Associates Corp.,* 908 F. Supp. 265, 270 (E.D. Pa. 1995) (citing *Kodak*, 504 U.S. at

481 and *Bushie v. Stenocord Corp.*, 460 F.2d 116, 121 (9th Cir. 1972)).  Plaintiff does not argue

that its claims fall under either the "aftermarket" or "total market dominance" exceptions, nor

does Plaintiff offer any authority in support of its novel theory.  Tr. 17:23-18:20.  Rather,

Plaintiff argues that cases "where a manufacturer is alleged to have monopolized the sales of its

own product" are irrelevant here, because Plaintiff alleges that a *distributor* "monopolized the

market for distribution of products that it buys from" the manufacturer.  Pl.'s Br. 14.  But even if

this Court were to agree with Plaintiff that a market for *distribution* of a single-manufacturer's

goods is somehow distinct from a market for *sales* of a single-manufacturer's goods, and thus

agree that existing authority is largely inapposite, Plaintiff's factual allegations themselves do

not support the narrow market definition that Plaintiff asserts.

---

[13]     The Supreme Court explained that "a tying arrangement is an agreement by a party to sell one
product but only on the condition that the buyer also purchases a different (or tied) product, or at least
agrees that he will not purchase that product from any other supplier." *Kodak*, 504 U.S. at 461-62
(citation and internal quotation marks omitted).

20

Plaintiff repeatedly alleges in its Complaint that retailers must buy the *full line* of all manufacturers' mass market cigar brands, and therefore, distributors must carry the same *full line* to sell to retailers.[14] If the Court accepts Plaintiff's allegations as true, then the relevant product market appears to be the *full line* of mass market cigars, consisting of every brand produced by every major manufacturer, rather than any subset thereof. Indeed, where it is recognized as necessary in an industry to carry a full line of products, courts have permitted plaintiffs to define the market as the "full line" of those particular products. *See, e.g.*, *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282-85 (10th Cir. 2004) (acknowledging that a viable product market can exist for a "cluster" of products or services when the cluster "is *itself* an object of consumer demand").

Curiously though, despite Plaintiff's emphasis on the necessity of carrying *all* manufacturers' brands, Plaintiff does not allege a market composed of all brands. Instead, Plaintiff carefully defines the market as composed of only CA's brands. In doing so, Plaintiff has created conflict within its own allegations, and ultimately asserted a market that is simply untenable. After all, for the same reasons a distributor could not substitute a CA-brand cigar with another brand of cigar in the market that Plaintiff describes, a distributor could not substitute *any* brand for *any* other brand. Plaintiff cannot just "define the relevant product market as that group of products over which defendants' anticompetitive conduct exercises control," and rely on discovery to rationalize its allegations. *Carell*, 104 F. Supp. 2d at 265

---

[14] Plaintiff also highlighted at oral argument the necessity of carrying the full line. Tr. 35:8-15; *see also id.* at 16:19-17:11, 27:8-16.

(citation and internal quotation marks omitted). There is simply no reason to single out CA's cigars in the market alleged here.[15]

Given these internal inconsistencies in Plaintiff's own allegations, and in the absence of authority supporting Plaintiff's position, the Court finds that Plaintiff has failed to carry its burden of alleging a plausible product market. Accordingly, Defendants' motions to dismiss are granted and the Court does not reach Defendants' remaining arguments as to these claims.

## IV.   CONCLUSION

For the reasons discussed above, the CA Defendants' Motion to Dismiss (Doc. 22) is denied as to Count I of Plaintiff's Complaint and granted as to Counts V and VI. Defendant HLA's Motion to Dismiss (Doc. 23) is denied as to Count II and granted as to Counts III, IV, V, and VI of Plaintiff's Complaint.

An appropriate Order follows.

---

[15]     If CA's brands of cigars *could* be singled out as a legally cognizable "submarket," a parallel submarket should also exist for distribution of every other manufacturer's brands, given the inability of a distributor to substitute any brand for any other in the market alleged. But at oral argument, Plaintiff specifically denied the possibility of submarkets for the distribution of other manufacturers' brands, creating further inconsistencies in Plaintiff's allegations. Tr. 72:4-21.